# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

|  |  |
|---|---|
| **JONATHON ROWLES and GEORGE HOLLOWAY, as individuals and class representatives of others similarly situated,**<br><br>**Plaintiffs,**<br>**v.**<br><br>**CHASE HOME FINANCE, LLC,**<br><br>**Defendant.** | **Civil No. 9:10-cv-01756-MBS**<br>**Hon. Margaret B. Seymour**<br><br>**JOINT RESPONSE OF PARTIES TO COURT ORDER DATED APRIL 29, 2011** |

Plaintiffs and proposed Class Representatives Jonathon Rowles and George Holloway, and defendant Chase Home Finance, LLC ("Chase")[1] (collectively, the "Parties"), hereby submit their Joint Response to the Court's Order dated April 29, 2011. (D.E. 39.)  The capitalized terms shall have the same meanings as defined in the Settlement Agreement submitted to the Court for preliminary approval.  The Parties will be prepared to discuss any of the issues raised in the Court's Order of this response at the preliminary approval hearing scheduled for May 6, 2011.

## QUESTION 1:

On page 1, Section 1.1 of the Settlement Agreement, the definition of the term "Actual Refunds" is given.  On page 2, Section 1.11 of the Settlement Agreement, Fund I is defined.  On page 3, Section 1.12, Fund II is defined.  What types of damages are contemplated by each of these terms?

---

[1] As of May 1, 2011, defendant is known as JPMorgan Chase Bank, N.A., successor by merger to Chase Home Finance, LLC.

**RESPONSE TO QUESTION 1:**

As explained in greater detail in Chase's Joinder to the Motion for Preliminary Approval of Class Settlement ("Joinder"), at 3-5, the Actual Refunds are the result of Chase's internal investigation of potential breaches of its obligations under the Servicemembers Civil Relief Act, 50 U.S.C. App. §§ 501, *et seq*. ("SCRA").[2]  The amount of the Actual Refunds was intended by Chase to compensate Class Members for monetary losses that may have been caused by Chase's receipt of funds in excess of those permitted under Section 527 of the SCRA, 50 U.S.C. App. § 527.  That provision, in relevant part, requires lenders to reduce the effective interest rate on home loans to no more than 6% during the period of active duty service and, since July 2008, for an additional year thereafter.  *Id.*  This section of the SCRA defines "interest" as including "charges" and "fees."  50 U.S.C. App. § 527(d)(1).  To obtain this benefit, servicemembers must act by sending the lender their active duty orders, and the underlying loan must have been originated while the servicemember was not on active duty.  *Id.*  Accordingly, the Actual Refunds were calculated by:

(a)    Identifying during the Class Member's period of SCRA protection whether any fees were paid since January 1, 2005;

(b)    Identifying during the Class Member's period of SCRA protection whether any interest in excess of 6% was paid since January 1, 2005;

(c)    To the extent any such fees or interest had not previously been returned to the Class Member, those amounts were totaled, and are referred to as the Original Estimated Refunds; and

---

[2] Chase expects to file its Joinder today.

     (d)     To ensure the refund is broadly inclusive, Chase then added an additional amount,[3] which in most cases represented at least double the Original Estimated Refund.

The following chart provides the protocol used by Chase to determine the Actual Refund amounts mailed to Class Members:

| If Original Estimated Refund is: | Actual Refund is: |
|---|---|
| $0 to $250 | $500 |
| $251 to $500 | $1,000 |
| $501 to $750 | $1,500 |
| $751 to $1,000 | $2,000 |
| $1,001 to $2,000 | $4,000 |
| $2,001 to $3,000 | $6,000 |
| $3,001 to $4,000 | $8,000 |
| $4,001 to $5,000 | $10,000 |
| $5,001 to $9,999 | Original Estimated Refund rounded up to the next $1,000, and then doubled |
| $10,000 and greater | Original Estimated Refund rounded up to the next $100, then add $10,000 |

As Chase has shared with plaintiffs in a verified statement, approximately 77% of the Actual Refunds to date are $500 (Original Estimated Refunds of $0-$250) and 90% are $1,000 or less (Original Estimated Refunds of $0-$500).  Chase will mail all Actual Refunds to each Class Member regardless of whether the Class Member chooses ultimately to participate in the settlement by not opting out.

If a Class Member chooses to participate in the settlement, he or she will get a distribution from Fund I.  Fund I is intended to provide a guaranteed recovery to all participating

---

[3] Chase's internal review is ongoing.  Chase anticipates that, going forward, borrowers identified as having paid any fees or any interest paid above 6% during the period of their SCRA protection will get an Actual Refund check reflecting those precise amounts, plus interest at 7.25%.

Class Members in addition to their Actual Refund. Fund I will be distributed according to a formula which multiplies the Original Estimated Refund amount, though the minimum payment to a Class Member from Fund I, even those whose Original Estimated Refund was $0, will be $100. Assuming the total number of Class Member loans participating in the settlement is at least 8,000, the multiplier is estimated to be 6.2, and the average payment per loan from Fund I would be approximately $1,500[4].

The Actual Refund payments and tiered payments distributed from Fund I should materially exceed any actual overcharge of interest or fees paid to Chase by the Class Members. Together, the Parties expect that those payments should at least compensate Class Members for actual damage claims they may have, and in many cases will exceed those actual damages claims. Fund II was established as a generous safeguard to pay any claims that Class Members may have for additional consequential damages arising out of any alleged SCRA violations relating to Chase's servicing of their home loans. That includes any additional compensation they might be owed for emotional distress, pain and suffering, economic loss, and/or credit defamation not captured by the Actual Refund or Fund I distribution. As the Court recognizes elsewhere, the awards from Fund II are subject to a claim process administered by a Court-appointed Special Master.[5]

---

[4] The actual formula cannot be calculated in advance because it depends on the total number of Class Member loans participating in the settlement. The settlement administrator will take that total number of participating loans, and, after paying the $100 minimum amounts, calculate the multiplier of the Original Estimated Refunds on the remaining loans that will exhaust the monies in Fund I. *See* Settlement Agreement at Section 5.1.

[5] As Chase comments in its Joinder (at 8-11), these recoveries also need to be viewed in the context of a compromise of the pending claims. Chase's Joinder argues that substantial questions existed, and would have to be resolved but for this settlement, including whether any private right of action existed for the claims in this action, and, if so, whether any damages beyond actual economic loss would be recoverable.

**QUESTION 2:**

Page 2, Section 1.9(b) of the Settlement Agreement appears to indicate that Class Members will have thirty-five days to appeal any approval of the settlement before the settlement becomes effective.  In this context, where many Class Members are likely to be serving on active duty away from home and possibly overseas, is thirty-five days a sufficient amount of time?

**RESPONSE TO QUESTION 2:**

The time period within which a Class Member must notice an appeal is not set by the Settlement Agreement, but instead by the Federal Rules of Appellate Procedure.  Specifically, in these circumstances, Fed. R. App. P. 4(a)(1)(A) provides a 30-day period for an objecting Class Member to notice an appeal of an order or judgment of this Court finally approving the settlement.  Section 1.9(b) of the Settlement Agreement merely takes that period into account in calculating the Effective Date – the point from which Chase is obligated to perform the core of the settlement, including by paying the prescribed benefits to class members.  As is standard in class settlements, the defendant is not obligated to pay those benefits until any appeals are decided which might alter those obligations, or the time for noticing such appeals has expired.

Moreover, although the Parties share the Court's general concern about the particular difficulties some Class Members could experience if they are deployed overseas, the Parties respectfully submit that those concerns are mitigated in connection with the time period to notice an appeal.  Under settled law, in order to have standing to notice an appeal of the Court's approval of a class settlement, the class member must have lodged his or her objections before that approval was granted.  *See Devlin v. Scardelletti*, 536 U.S. 1, 11 (2002) (holding that "the power to appeal is limited to those nonnamed class members who have objected during the fairness hearing").  Accordingly, any Class Member with standing to notice a proper appeal will already have made a timely objection and will likely be watching the approval process closely as a result.

- 5 -

Lastly, even if the Parties were at liberty to expand the time period within which an appeal could be properly noticed, they submit that the interest of a potential appellant in filing a later appeal would be outweighed considerably by the interest of the remaining Class Members in having the settlement benefits distributed without having to wait for an appeal to run its course – a period which averages now in excess of 9 months in the Fourth Circuit.

**QUESTION 3:**

On page 4, Section 3.1 of the Settlement Agreement the definition of the Settlement Class indicates that Class Members will include only those to whom Chase has sent or will send an Actual Refund by the Class List Close Date.  How will this determination be verified?

**RESPONSE TO QUESTION 3:**

See Response to Question 1.  Chase is required in advance of the final fairness hearing to certify under oath the facts as to its determinations of the Original Estimated Refund amounts, and the Actual Refund amounts, and that it did in fact mail each of those amounts to Class Members.  Chase intends to submit in that certification for each Class Member:

- his or her name;

- the loan numbers and property at issue;

- the amounts of fees and interest calculated as due under the Original Estimated Refund; and

- the amount of each Actual Refund mailed and the address used to mail it.

Given the extremely private and sensitive nature of this material, Chase intends to submit this underlying information to the Court under seal or in such other manner as to ensure that it is not disclosed publicly.

**QUESTION 4:**

On page 4, Section 3.1 of the Settlement Agreement, the definition of the Settlement Class limits membership in the class to borrowers as of January 1, 2005. Why was this date chosen?

**RESPONSE TO QUESTION 4:**

That date was chosen to help ensure that the scope of Chase's refunds, and now the Class Membership that follow those refunds, is broader than any likely class would be if this action were litigated. The SCRA does not contain a governing statute of limitations with respect to the claims asserted in this lawsuit. Instead, the four-year catch-all for statutory claims provided in 28 U.S.C. § 1658 is likely the most expansive statute of limitations that would apply.

This action was filed July 6, 2010, making July 6, 2006, the likely cut-off for any class action if the matter were litigated. This is true because issues of whether an individual's claim beyond the applicable statute of limitations is tolled are typically viewed as highly individualized, and therefore not amenable to class certification in a litigated context, as explained in greater detail in Chase's Joinder at pages 8-9.

The settlement here captures eligible servicemembers with mortgage loans, or secured home equity loans or lines of credit, which were serviced by Chase at any time since January 1, 2005. In that manner, it provides benefits to individuals for an additional 19 months beyond the likely applicable four-year statute of limitations.

**QUESTION 5:**

On pages 4 and 5, Section 3.3 of the Settlement Agreement provides for only one means of notifying potential Class Members of the settlement —by direct mail. Given that many of the Class Members are likely to be serving on active duty away from their residences and possibly overseas, and that putative Class Members are subject to deadlines for opting out of the class and submitting special claims, among other things, will direct mail provide a reasonable method to notify those individuals?

**RESPONSE TO QUESTION 5:**

The Parties refer the Court to Chase's Joinder at pages 12 to 16 for a more detailed discussion of the reliability of the mailing addresses and mailing processes to be used in this settlement. "It is beyond dispute […] that notice by first class mail ordinarily satisfies Rule 23(c)(2)'s requirement that class members receive 'the best notice practicable under the circumstances.'" *Robinson v. Fountainhead Title Group Corp.*, No. WMN-03-3106, 2009 U.S. Dist. LEXIS 82346, at *2 (D. Md. Sept. 4, 2009).

The Parties further submit that, while they are willing to consider publication notice in the military press to augment direct mail, the trend among federal courts has been to move away from publication notice because legal notices are not considered effective means of communicating with Class Members, and have appeared to serve the interest only of individuals known as "professional objectors" who scour such notices opportunistically. *See, e.g.*, Brian Walters, *Best Notice Practicable in the Twenty-First Century*, 2003 UCLA J.L. & Tech. 4, ¶ 13 (2003), http://www.lawtechjournal.com/home/articles/27/.

The Parties submit that the Class Members would be better served by the use of a settlement website, and propose to have one maintained by the Settlement Administrator. If the Court approves of this idea, the Parties would amend the Settlement Agreement to add the following provision:

> **3.3.1    Settlement Website.** The Settlement Administrator shall maintain a dedicated settlement website at www.ChaseSCRASettlement.com, which shall (a) prominently display the Class Notice, Opt-Out form, and Special Claim form, (b) provide an online and toll-free, interactive voice response number whereby Class Members may request additional information or documents, in which event appropriate information shall be promptly provided by the Settlement Administrator, and (c) make available for download the operative complaint, this Settlement Agreement, and any orders and other documents from the Court relating to the Settlement. The toll-free number shall also allow Class Members to update their mailing address, and shall provide answers to frequently asked

questions, the text of which shall conform to the Class Notice approved by the Court.

The use of a settlement website is especially appropriate because of the significant coverage given to this case and the settlement in particular in print and television media. The story has been covered in the military press:



military-chas
ettlem_marine

http://www.armytimes.com/news/2011/04/military-chase-settlement-rowles-042211w/

http://www.navytimes.com/news/2011/04/military-chase-settlement-rowles-042211w/

http://www.airforcetimes.com/news/2011/04/military-chase-settlement-rowles-042211w/

Together with direct mail notice, the Parties believe that the proposed protocol for communicating with Class Members more than satisfies the due process requirements.

**QUESTION 6:**

Page 5, Section 3.4 addresses Chase's right to void the settlement. Is this an event the parties anticipate to be likely?

**RESPONSE TO QUESTION 6:**

Given the tremendous benefits afforded by participating in the settlement, the Parties do not anticipate that the thresholds articulated in Section 5.4 of the Settlement Agreement will be reached.

**QUESTION 7:**

On page 7, Section 5.1, the Settlement Agreement provides that checks made out of Fund I will be negotiable for sixty days. Given the context of this action in which many Class Members will likely be serving on active duty away from home and possibly overseas, is this a sufficient amount of time for Class Members to deposit or cash their checks? Why?

**RESPONSE TO QUESTION 7:**

Chase has agreed that the settlement checks will be negotiable for 180 days, which is the same period within which the Actual Refund checks remain negotiable. The Parties share a concern that a longer period of time than 180 days could negatively incent at least some Class Members not to act to negotiate the check immediately, and possibly lead to more checks being misplaced or lost.

**QUESTION 8:**

On page 7, Section 5.2, the Settlement Agreement provides a deadline of seventy-five days after the final approval hearing, or by such other date as the court may set, for the submission of Special Claims Forms. Again, considering that Class Members are likely to be serving on active duty away from their homes and possibly overseas, is seventy-five days a reasonable deadline? Why?

**RESPONSE TO QUESTION 8:**

The Parties are amenable to expanding this deadline as the Court sees fit. They do, however, believe that 75 days is a reasonable time period. First, they note that Class Members can submit Special Claim Forms anytime after they are received, and would expect a substantial percentage of the Special Claim Forms to be submitted within the at least 120 days proposed between the mailing of the Class Notice and Special Claim Forms, and the final fairness hearing.[6] The 75 days at issue here provides an additional period of time after final approval is granted for Class Members to submit those Special Claim Forms. The Parties believe that this additional period of time is important to those Class Members who may otherwise hold off on submitting a Special Claim Form until the Court finally approves the settlement. But, even in those cases, the Parties believe the total time period within which to submit a claim – 195 days – must be considered in determining the reasonableness of these provisions. Second, the Parties

_____

[6] The 120-day period appears in the Class Notice, Section 17.

believe that the periods for Class Notice, opt-outs, the final fairness hearing, and the submission

of Special Claim Forms are reasonable in light of the especially reliable mailing addresses used

and incentives for servicemembers to maintain reliable mailing addresses even when deployed

overseas.  (*See* Joinder at 12-16.)  Lastly, the Parties submit that such an extension must

appropriately weigh the interest in accommodating Class Members who may desire more time to

complete a Special Claim Form with the countervailing interest of Class Members who seek to

timely realize the benefits of the settlement.

**QUESTION 9:**

On page 7, Section 5.2.2, additional funding in an amount up to $500,000 is provided for
Fund II, but only for damages related to wrongful foreclosures that go above the $15,000,000
cap.  How will it be decided when this additional funding must be provided by Chase?  Will
wrongful foreclosures be counted first or last when determining the awards to be paid out of
Fund II?

**RESPONSE TO QUESTION 9:**

Under Section 5.2.1 of the Settlement Agreement, the initial $15,000,000 cap comes into

effect only if the total amounts of all Fund II awards, including those that relate to wrongful

foreclosures, exceed that initial cap.  In other words, the awards relating to wrongful foreclosures

are counted at the same time and in the same manner as any other Fund II awards to see if the

$15,000,000 cap is exceeded.  If that initial cap is exceeded by the total of all Fund II awards, all

those awards are reduced on a pro rata basis, but the additional funding requirement of

Section 5.2.2 is engaged to pay additional compensation to those with Fund II awards relating to

wrongful foreclosures.  More specifically, Chase is obligated to pay the difference between the

original Fund II awards for such Class Members and the amount by which those awards were

reduced through the prorating under Section 5.2.1, up to an additional $500,000.  If the total

shortfall between the original Fund II awards for these Class Members and their prorated awards

is greater than $500,000, each will receive a proportional share of the $500,000.

**QUESTION 10:**

On page 8, the Settlement Agreement provides that the Special Master will have three months to determine the Special Claims awards that will be paid out of Fund II. Explain why this is a sufficient amount of time for the Special Master to accomplish this. Will the Special Master be provided with staff to assist him or her in this endeavor? If so, how will the staff of the Special Master be paid?

**RESPONSE TO QUESTION 10:**

The Parties agree that the Special Master shall be required to petition the Court for an extension of the 3-month period to decide Fund II awards contained in Section 5.2 of the Settlement Agreement, as may be necessary. That said, the Parties expect that the Special Master will not need to wait until the deadline for submitting Special Claim Forms to begin deciding the awards due under Fund II. Moreover, the Special Master proposed by the Parties – the Honorable Edward Cahn (ret.) – has 23 years' experience as a federal district court judge, and particular experience handling claims in similar circumstances. Judge Cahn, if appointed, will have administrative, paralegal, and attorney support from the Blank Rome firm, with which he is affiliated, to fulfill his obligations under the settlement. Chase will pay for all such reasonable services as part of the costs of administering the settlement, which are reimbursed separate and apart from its obligation to provide benefits directly to Class Members. *See* Settlement Agreement, Section 8.

**QUESTION 11:**

On page 8, the Settlement Agreement provides that the Special Master may consider Special Claim Forms submitted up to three months late, and provide for an award if the Special Master determines that there was "good cause" for the late submission. Would good cause include an inability to submit a Special Claim Form while on active duty away from home?

**RESPONSE TO QUESTION 11:**

Yes. That was the primary reason to allow late-submitted claims. Under the previously proposed timelines for class notice, the final fairness hearing, and the Special Claim deadline,

this would allow a Class Member up to approximately 7 months to submit a timely claim, and an

additional 3 months to submit a late claim for good cause.

**QUESTION 12:**

On page 8, the Settlement Agreement provides that the checks for Fund II payments will
be negotiable for sixty days.  Given the context of this action in which many Class Members will
likely be serving on active duty away from home and possibly overseas, is this a sufficient
amount of time for Class Members to deposit or cash their checks?  Why?

**RESPONSE TO QUESTION 12:**

As with the payments due Class Members from Fund I (*see* Response to Question 7),

Chase has agreed that the settlement checks will be negotiable for 180 days, which is the same

period within which the Actual Refund checks remain negotiable.  The Parties share a concern

that a longer period of time than 180 days could negatively incent at least some Class Members

not to act to negotiate the check immediately, and possibly lead to more checks being misplaced

or lost.

**QUESTION 13:**

With regard to the foreclosures referenced on page 9 in Section 7.2 of the Settlement
Agreement, should there be, or is there a deadline for the remediation of foreclosures?

**RESPONSE TO QUESTION 13:**

The foreclosure remediation was announced prior to this settlement and is being provided

whether or not the affected Class Member participates in the settlement.  That is, even if a Class

Member entitled to remediation opts out of the settlement and provides Chase with no release of

claims, Chase will still offer the full complement of foreclosure remediation due that individual.

Chase will certify under oath all such remediation completed, and its value, to the Court in

advance of the final fairness hearing.  Chase also intends to offer immediately—within the next

several weeks—the remediation due all identified borrowers who were the subject of a wrongful

foreclosure under the SCRA.  There is no deadline provided in the Settlement Agreement for this

remediation due to (a) the obligation Chase undertook to provide this relief independent of the

settlement, (b) the possibility that individual borrowers may wish to negotiate the extent of the

benefits provided under the foreclosure remediation program, and (c) Chase's commitment into

the future to undertake this level of remediation should it at any time later discover an additional

instance of a wrongful SCRA foreclosure.  That said, any Class Member who believes that he or

she should have received the foreclosure remediation, but did not, has the right to make a claim

for that relief directly to the Special Master, who in turn must make a report to the Parties and the

Court about such claims by the Special Claims Deadline.  *See* Settlement Agreement,

Section 7.2.

**QUESTION 14:**

On page 9, Section 7.3 of the Settlement Agreement provides for a rate reduction for "borrowers eligible for the benefits under Section 527 of the SCRA from 6% to 4%. . . ."  Does the term "borrowers" refer only to Class Members, or all individuals entitled to protection under the SCRA?  Will this rate reduction be permanent?  If not, how long will the rate reduction remain in effect?  Will the rate reduction apply only to currently outstanding loans?

**RESPONSE TO QUESTION 14:**

The term "borrowers" there refers more broadly than to Class Members.  It includes all

individuals whose home loans are serviced by Chase and who are entitled to the benefits of

Section 527 of the SCRA.  These borrowers may not be Class Members because, among other

reasons, they may not be eligible for those benefits today, for the reason that they are not yet

serving on active duty, their loans are not yet serviced by Chase, or the loans have not even been

originated.  This benefit, like the foreclosure remediation, is being provided independent of the

settlement and without regard to whether the beneficiary is an eligible Class Member who opts

out of the settlement.  Chase has not set any expiration or fixed term for the program.  It is a

voluntary reduction in the rate for eligible borrowers beyond the requirements of the SCRA.  The

value of this program to borrowers recited in Section 7.3 of the Settlement Agreement is calculated only for the first year of its implementation.

**QUESTION 15:**

On page 10, Section 9.1 of the Settlement Agreement addresses the Parties' agreement with regard to attorneys' fees. What will the request for attorneys' fees be based upon? For example, attorneys fees in a class action can be based upon a percentage of the settlement amount or based upon the number of hours worked at that market rate. If the request will be based upon the number of hours worked, the court will need to be provided with documentation with regard to the number of hours worked by attorneys and paralegals to conduct a lodestar cross-check.

**RESPONSE TO QUESTION 15:**

Plaintiffs respond that the attorneys' fee request will be based upon a percentage of the settlement. As the Court recognizes, the two traditional methods of attorneys' fee calculation in the class action context are 1) a percentage of the common fund allotted to the class members, and 2) a lodestar calculation based primarily upon an hourly rate and a lodestar multiplier.

> In class action cases in which the plaintiff class recovers benefits from a common fund, the favored method of calculating attorneys' fees is to award a percentage of the fund. Such awards are favored because they directly align the interests of the class and its counsel and provide a powerful incentive for the efficient prosecution and early resolution of litigation.

*Radosti v. Envision EMI, LLC*, CIV.A. 09-887 CKK, 2011 WL 159662 (D.D.C. 2011) (internal citations omitted).

As the Plaintiffs detailed in the Petition for Preliminary Approval of Settlement, the approximate value of the common fund of benefits created for the class members is $48 million. In addition, the Parties have agreed to a payment of up to $8 million in attorneys' fees to Class Counsel, resulting in a total class benefit of $56 million. *See* Manual for Complex Litigation, Fourth, § 21.71 p. 525 ("If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses . . . the sum of the two amounts ordinarily should

be treated as a settlement fund for the benefit of the class[.]")  As such, Plaintiffs will request

approval of attorneys' fees amounting to 14.29% of the award to the class.  However, it is

important to note that these fees will be paid in addition to the class award rather than deducted

from each class member's recovery.

**QUESTION 16:**

On page 10, Section 11 of the Settlement Agreement provides for the dismissal of the action upon final approval of the settlement.  The amended complaint in this action alleged violations of the SCRA related to auto loans.  The second amended complaint that is currently before the court and the Settlement Agreement only appear to deal with alleged violations of the SCRA related to real property loans.  What is the status of the auto loan claims?  Please explain what if any claims will go forward subsequent to any approval of the proposed settlement.

**RESPONSE TO QUESTION 16:**

By the filing of the First Amended Complaint, the auto loan claims were dismissed

without prejudice, both as to plaintiff Martin Hupfl and as to the putative auto class.  The parties

intend to engage in continued negotiations about the resolution of those claims, and have

executed a separate standstill agreement to preserve their rights in the interim.  The approval of

the class action settlement before the Court would effect a dismissal of only those claims relating

to Chase's servicing of home loans.  *See* Settlement Agreement, Section 3.1 (defining Class

Members as limited to those whose loans were serviced by Chase and its affiliated entities) and

Section 4.1 (limiting the release to claims arising out of the servicing of home loans).  Whether

any claims relating to auto loans are refiled will depend on the outcome of those separate

discussions.

**QUESTION 17:**

On page 11, Section 13 of the Settlement Agreement, Class Counsel and the Class Representatives agree not to disparage Chase with respect to any issue related to this Action. However, Chase only agrees not to disparage the Class Representatives publicly or in the media regarding this Action.  Explain any differences in the restrictions.

**RESPONSE TO QUESTION 17:**

These provisions are intended to be bilateral in scope and differ only because, with

respect to possible enforcement, they deal with individuals in the first instance, and a corporation

in the second.

**QUESTION 18:**

The court notes that there is no provision in the Settlement Agreement for Class Members who choose not to opt out of the Settlement to verify their addresses. Could this lead to Class Members not receiving their share of the Class Settlement? How will the parties ensure Class Members' receipt of their portion of the settlement?

**RESPONSE TO QUESTION 18:**

Please see Chase's Joinder at 13-15 with respect to the treatment of undeliverable mail,

including settlement checks. The Class Notice will ask Class Members to provide updated

address information to the Settlement Administrator. If approved by the Court, the proposed

settlement website discussed in Response to Question 5 will also allow Class Members to update

their mailing address. The Parties agree to amend the Settlement Agreement to reflect any of

these changes approved by the Court.

**QUESTION 19:**

Is the proposed deadline for opting out (45 days prior to the final approval hearing as stated in paragraph 10 of the proposed Preliminary Approval Order) contained in the Settlement Agreement? If so, which section? If not, should the deadline for opting out be inserted into the Settlement Agreement?

**RESPONSE TO QUESTION 19:**

No. Because that deadline is to be set by the Court, the Parties have not set it out in the

Settlement Agreement itself, in order to avoid the necessity of amending the Settlement

Agreement if that period is altered at the preliminary approval stage. Instead, the precise

deadline for opting out is reserved for the proposed Preliminary Approval Order and the Class

Notice (Exhibits A and B to the Settlement Agreement).

**QUESTION 20:**

Is the deadline for opting out reasonable given that many Class Members are likely serving on active duty away from home and the only form of proposed notice is a direct mailer to the Class Members' residences?

**RESPONSE TO QUESTION 20:**

The Parties are amenable to expanding this deadline as the Court sees fit.  The Parties

believe that, for sound administration reasons, setting of the opt-out deadline 45 days in advance

of the final approval hearing is appropriate.  To elongate the period within which Class Members

would need to exercise the right to opt out, the Court should instead set the final approval hearing

more than the proposed 120 days after the mailing of the Class Notice, Opt-Out Form, and

Special Claim Form.  The Parties continue to believe that the Court should set the final approval

hearing between 120 days and 160 days after the mailing of those notices in light of the

reliability of the mailing addresses used and the appropriate weight given to the interests of Class

Members who seek to timely realize the benefits of the settlement.

**QUESTION 21:**

What is the significance of paragraph 14 in the proposed Preliminary Approval Order?

**RESPONSE TO QUESTION 21:**

The Parties submit that it is customary in class settlements to include such language in the

event that the Court decides that the final approval hearing should continue for one reason or

another beyond the date initially scheduled and provided in the formal Class Notice.  This

language is not intended to indicate that the Court would alter its regular practice of entering any

order adjourning the final approval hearing in its official docket so that it would be publicly

available.  It is intended to clarify for Class Members and the Parties that no additional Class

Notice will be sent in such circumstances.  If the Court approves the proposed settlement website

discussed in Response to Question 5, any order of adjournment would be timely posted there as

well.

**QUESTION 22:**

Is the deadline for submitting objections to the Settlement Agreement (45 days prior to the final approval hearing as stated in paragraph 12 the proposed Preliminary Approval Order) contained within the Settlement Agreement? If so, which section? If not, should the deadline for submitting objections to the Settlement Agreement be contained within the Settlement Agreement?

**RESPONSE TO QUESTION 22:**

No, for the same reasons the opt-out deadline is not provided in the Settlement

Agreement. *See* Response to Question 19.

**QUESTION 23:**

Is the deadline for submitting objections reasonable given that many Class Members are likely serving on active duty away from home and the only form of proposed notice is a direct mailer to the Class Members' residences?

**RESPONSE TO QUESTION 23:**

The Parties have the same response as the one directed at the reasonableness of the

opt-out deadline in Response to Question 20.

**QUESTION 24:**

Page 3 of the proposed notice states: "Chase is offering an enhanced loan modification program for all members of the military who have served on active duty as far back as September 11, 2001." This provision does not appear to be addressed in the Settlement Agreement. If this provision is contained in the Settlement Agreement, please point the court to the appropriate section of the Settlement Agreement. What is the "enhanced loan modification program"? How does it work? What benefits will it provide to the individuals it affects?

**RESPONSE TO QUESTION 24:**

This program is not part of the Settlement Agreement; it is still under development by

Chase. The Parties believe that the Class Members would nevertheless benefit from having some

information about its existence communicated in the body of the Class Notice so that they might

follow up with Chase as appropriate.  Alternatively, if the Court believes it a better approach, the

Parties are amenable to dropping the reference from the Class Notice.

**QUESTION 25:**

On page 6 of the proposed notice, Class Members are advised that they must submit Special Claim Forms to the Settlement Administrator along with "any accompanying information."  Should the Notice provide more detail as to what accompanying information and how much information will be necessary to support the Special Claims?

**RESPONSE TO QUESTION 25:**

The Parties believe that the "accompanying information" is adequately described in the

Special Claim Form (with the revisions noted in response to Question 33, below).

**QUESTION 26:**

Should the information about opting out of the settlement on Page 7 of the proposed notice be put in bold face type or otherwise made more conspicuous?

**RESPONSE TO QUESTION 26:**

The Parties believe that the Class Notice appropriately highlights topic headings and

deadlines within which Class Members must act to protect their rights.  The Parties do not think

that it is appropriate to single out for special treatment the text relating to the right to opt out.

Doing so might tend to suggest that opting out is the preferred course, where the appropriate

disposition of the Class Notice is to allow the Class Members to make the choice of which

option—participate, participate and object, or opt out—is the most appropriate course for them.

**QUESTION 27:**

On pages 8-9 of the proposed notice, Class Members are advised of information that they must include with their objections including the case name, their name and address, and other information.  Should Class Members also be required to indicate in their objections whether or not they wish to appear and be heard at the fairness hearing?

**RESPONSE TO QUESTION 27:**

The necessity of filing a notice of intent to appear is addressed separately in Section 19 of the Class Notice, entitled: "May I Speak at the Hearing."

**QUESTION 28:**

The court has concerns about requiring Class Members who object to the settlement to file documents with the court.  How is this to be accomplished through the electronic filing system?

**RESPONSE TO QUESTION 28:**

The Parties have investigated numerous methods to facilitate the filing of objections.  The method that places the least burden on Court staff, however, will be to provide Class Counsel and Defense counsel with notice of the objections.  At the close of the period in which objections may be registered, Class Counsel and Defense Counsel will confer and certify, under oath, a copy of all objections to be filed with the Court within 10 days of the end of the objection period.

The Parties submit that, given the independent legal significance that filing an objection has on a Class Member's rights (*see* Response to Question 2), it would be improper to waive the requirement that objections be filed with the Court, as well as served on the Parties.

**QUESTION 29:**

On page 9 of the proposed notice, the date and location of the fairness hearing are provided.  Should this information be made more conspicuous?

**RESPONSE TO QUESTION 29:**

The Parties are amenable to increasing the conspicuousness of the hearing information, through increasing the font size, bolding, or otherwise.

**QUESTION 30:**

The answer to question 21 on page 10 of the proposed Notice indicates that Class Members may obtain the complaint, the Settlement Agreement and "other governing Settlement documents."  What does the term "other governing Settlement documents" refer to?

**RESPONSE TO QUESTION 30:**

The approved and finalized exhibits, Court orders relating to the settlement, and any amendment to the Settlement Agreement or its exhibits.  If approved by the Court, this same information would be available for download from the proposed settlement website.  *See* Response to Question 5.

**QUESTION 31:**

Should the proposed form for opting out of the settlement state the case name at the top?

**RESPONSE TO QUESTION 31:**

The Parties agree that this is a beneficial change, and have revised the form accordingly.

**QUESTION 32:**

Should the proposed form for opting out of the settlement include a place for the address of the individual opting out?

**RESPONSE TO QUESTION 32:**

Because the Class Member is excluding herself or himself from the settlement and would thereby no longer receive communication about it, such address updating is not requested.

**QUESTION 33:**

Should the Special Claim Form provide Class Members with some examples of supporting documentation that should be submitted?

**RESPONSE TO QUESTION 33:**

The Parties have added a more thorough description of what such supporting

documentation might consist of.  (*See* Revised Special Claim Form, attached as Exhibit 1.[7])

**QUESTION 34:**

Will a toll free number be provided for Class Members to contact the Claims
Administrator with questions on the notice, procedure for filing objections, and completing
required forms?

**RESPONSE TO QUESTION 34:**

Yes.  The Special Claim Form will include that number, as well as a dedicated email

address.  The Special Claim Form will be revised accordingly.

Dated: May 4, 2011                          By: _s/ Graham L. Newman_____
                                            Richard A. Harpootlian (Fed. I.D. #11730)
                                            Graham L. Newman (Fed. I.D. #9746)
                                            RICHARD A. HARPOOTLIAN, P.A.
                                            1410 Laurel Street
                                            Post Office Box 1040
                                            Columbia, South Carolina 29202
                                            Telephone: 803.252.4848
                                            Facsimile:  803.252.4810
                                            rah@harpootlian law.com
                                            gln@harpootlianlaw.com

                                            William B. Harvey III (Fed. I.D. #1762)
                                            HARVEY& BATTEY, P.A.
                                            1001 Craven Street
                                            Post Office Drawer 1107
                                            Beaufort, South Carolina  29902-1107
                                            Telephone:843.524.3109
                                            Facsimile: 843.524.6973
                                            bharvey@harveyandbattey.com

                                            Attorneys for Plaintiffs and
                                            Plaintiff Class

---

[7] The Parties attach both a clean copy, incorporating the revisions, and a redline, showing
those revisions.

By:   s/ Steve A. Matthews
    Steve A. Matthews (5119)
    smatthews@hsblawfirm.com
    James Y. Becker (5733)
    jbecker@hsblawfirm.com
    HAYNSWORTH SINKLER BOYD, P.A.
    1201 Main Street, 22nd Floor
    Columbia, South Carolina 29201-3232
    Telephone:   803.779.3080
    Facsimile:    803.765.1243

    Michael J. Agoglia (*Pro Hac Pending*)
    MAgoglia@mofo.com
    MORRISON & FOERSTER LLP
    425 Market Street
    San Francisco, California 94105-2482
    Telephone:   415.268.7000
    Facsimile:    415.268.7522

    Attorneys for Defendant
    Chase Home Finance, LLC

2989661